Filed 11/3/22  P. v. Limon CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE

## COURT OF APPEAL OF THE STATE OF CALIFORNIA

## IN AND FOR THE

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>SABRINA LEIGH LIMON,<br><br>　　Defendant and Appellant. | F077198<br><br>(Kern Super. Ct. No. BF166801A)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion filed herein on October 17, 2022, be modified in the following particulars:

1.　　On page 18, the word "rarely" is deleted in the last sentence in the first full paragraph that states, "Robert rarely worked in Tehachapi and, when he did, he was alone."  In its place, the word "occasionally" is inserted so that sentence now reads, "Robert occasionally worked in Tehachapi and, when he did, he was alone."

2.　　On page 53, the word "determine" is deleted in the first sentence appearing in the last paragraph that states, "In count 6, appellant was sentenced to a determine prison term of 16 months (the low term) for being an accessory after this murder."  In its place, the word "determinate" is inserted so that sentence now reads, "In count 6, appellant was sentenced to a determinate prison term of 16 months (the low term) for being an accessory after this murder."

3.      On page 56, the word "slightly" is deleted in the first sentence appearing in the second full paragraph that states, "Although appellant received a slightly longer prison sentence than Hearn, that does not factor into our analysis." As a result, that sentence now reads, "Although appellant received a longer prison sentence than Hearn, that does not factor into our analysis."

Appellant's petition for rehearing is denied. Except for the modifications set forth herein, the opinion previously filed remains unchanged. The modifications do not alter the judgment.

LEVY, Acting P. J.

WE CONCUR:

SMITH, J.

SNAUFFER, J.

Filed 10/17/22  P. v. Limon CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SABRINA LEIGH LIMON,<br><br>Defendant and Appellant. | F077198<br><br>(Super. Ct. No. BF166801A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

On August 17, 2014, Jonathan Hearn shot Robert Limon to death. At the time of this murder, Hearn was having an affair with Robert's wife, appellant Sabrina Leigh Limon, and Hearn eventually reached a plea agreement with the prosecution to testify against her.[1] A jury convicted appellant of first degree premeditated murder (Pen. Code, § 187, subd. (a);[2] count 1) for the death of her husband. The jury also convicted her of (1) conspiracy to commit murder (§ 182, subd. (a)(1); count 2); (2) solicitation to commit murder (§ 653f, subd. (b); count 3); and (3) being an accessory to the murder (§ 32; count 6).[3] In count 1, appellant was sentenced to an indeterminate term of 25 years to life. In count 6, she received a consecutive determinate low term of 16 months.[4]

Appellant raises numerous claims in the present appeal. In part, she contends that Hearn's accomplice testimony was not properly corroborated, the evidence is insufficient for most of her convictions, prosecutorial misconduct occurred, and the trial court failed to protect her constitutional rights in permitting the jury to be exposed to extensive media coverage.

We reject appellant's arguments. Evidence independent from Hearn's testimony conclusively connected appellant with Robert's murder. The prosecution established that appellant was deeply in love with Hearn both before and after he killed her husband. Appellant provided Hearn with critical information that permitted Hearn to confront and shoot Robert when Robert was working alone on an unexpected extra shift on August 17,

---

[1] Hearn is not a party in this matter.

[2] All future statutory references are to the Penal Code unless otherwise noted.

[3] The jury acquitted appellant in count 4 of an alleged attempted murder of Robert (§§ 664/187, subd. (a)), and it acquitted her in count 5 of allegedly mingling a harmful substance in food (§ 347, subd. (a)(1)).

[4] In count 2 (conspiracy), the court imposed but stayed a term of 25 years to life. In count 3 (solicitation), the court imposed but stayed a low term of three years.

2014, and she repeatedly lied and provided false leads to law enforcement during its investigation following this murder. Based on Hearn's corroborated testimony, overwhelming evidence established appellant's intent to solicit Robert's murder, her intent to kill, and her intent to conspire with Hearn to commit murder. Appellant's other arguments are wholly without merit and we affirm the judgment in its entirety.

## BACKGROUND

In this case, the jury had to make a credibility determination. Hearn testified that appellant wanted him to kill her husband and they conspired to commit this murder. In contrast, appellant claimed that Hearn had acted alone and she had no knowledge that Hearn was going to kill Robert.

We summarize the material facts in the light most favorable to the judgment. We include additional facts later in this opinion when helpful to understand the issues raised.

### I. Hearn's Agreement with the Prosecution.

Prior to testifying in this matter, Hearn was charged with premeditated murder, and he faced a prison sentence of life without the possibility of parole. In or about January 2017, however, he reached an agreement with the prosecution to testify against appellant. In exchange, Hearn was offered a prison sentence of 25 years four months based on a conviction of voluntary manslaughter with a firearm enhancement. He also pleaded to other charges.[5]

### II. Appellant's Open Marriage and her Affair with Hearn.

Appellant, who was born in 1979, started dating Robert when she was 18 years old. They were married almost three years later. The jury learned that, around 2008,

---

**5** Hearn was originally charged with first degree murder, along with a special circumstance allegation of lying in wait. He initially faced an indeterminate prison sentence of life without the possibility of parole or death, but the prosecution waived the death penalty before the plea agreement was reached. It was Robert's family who first suggested that authorities should attempt to reach a plea agreement with Hearn in exchange for Hearn's truthful testimony against appellant.

appellant and Robert "opened" their marriage and they began engaging in sexual activities with another couple. Over time, appellant and Robert engaged in sexual activities with other couples. Appellant told the jury that, once she and Robert opened up their marriage, she felt that their "sacred bond" had been broken.

In 2012, appellant started an affair with Hearn. She told the jury that her affair with Hearn started because of what was lacking in her marriage. At some point, Robert discovered some communications between appellant and Hearn, and Robert told appellant to stop seeing Hearn. On one occasion, Robert spoke with Hearn on the telephone, telling Hearn to stay away from appellant. Hearn and appellant stopped seeing each other for a short period of time. However, by the summer of 2013 their affair had resumed.

Hearn told the jury that, during his affair with appellant, she had complained to him about how Robert had opened up their marriage. According to Hearn, appellant had complained that Robert "was pretty exploitative" of her, and Robert was "objectifying" her. Hearn told the jury that, during the course of his affair with appellant, they began talking about killing Robert, which started as a joke. However, they eventually developed a plot to kill him.

Phone records show that, from November 2013 until March 11, 2014, appellant and Hearn exchanged about 526 phone calls and text messages to each other. From April 25 to June 1, 2014, they had about 1,600 calls and text messages to each other. From June 2, 2014, to September 1, 2014, they had about 5,909 calls and texts to each other. Starting on or about April 25, 2014, appellant and Hearn began communicating with each other primarily through a "burner" cell phone, which Hearn provided to her. They used this burner phone extensively to communicate with each other before Robert's murder on August 17, 2014.

4.

### III. The Alleged Poisoning Attempt.

Hearn told the jury that he and appellant originally had a plan to poison Robert. According to Hearn, he mixed arsenic trioxide into some pudding, which he gave to appellant.[6] She was going to put the poisoned pudding into Robert's lunch for him to eat at work. At trial, however, Hearn claimed that he and appellant had developed concerns that law enforcement would be suspicious of their relationship, especially their contact through their cell phones.[7] Hearn claimed at trial that he told appellant to hold off on the poisoning attempt.

At trial, appellant denied any knowledge of this alleged poisoning attempt. She denied ever communicating with Hearn about this plan. During closing argument, the defense asserted that Hearn's testimony lacked credibility because appellant had supposedly placed the poisoned pudding in her own refrigerator with her two young children in the house.

It is apparent that the jury did not believe Hearn regarding appellant's alleged role in an attempt to poison Robert. The jury acquitted her in count 4 of alleged attempted murder (§§ 664/187, subd. (a)), and it acquitted her in count 5 of allegedly mingling a harmful substance in food (§ 347, subd. (a)(1)). The jury also found the following three alleged overt acts *not* true as part of the charged conspiracy: (1) Hearn had mixed arsenic with pudding; (2) Hearn had delivered the pudding with arsenic to appellant's residence; and (3) appellant had placed the pudding with arsenic in Robert's lunch.

### IV. The Shooting.

Robert worked for BNSF Railway. He typically worked full time in Barstow, California, but he would occasionally work an overtime shift at a BNSF shop in

---

[6] Law enforcement recovered a bottle of arsenic trioxide near Hearn's residence. The full bottle would have held about 100 grams, and it was about half full when it was recovered.

[7] According to Hearn, the alleged poisoning attempt occurred before he provided appellant with the burner cell phone.

Tehachapi, California. When Robert worked at this shop, he worked alone on a 12-hour shift.

It is undisputed that, at some point during their relationship, appellant told Hearn about the general location of the BNSF shop in Tehachapi. It is also undisputed that appellant told Hearn that Robert would be working in Tehachapi on August 17, 2014.[8]

It was on August 16, 2014, when appellant learned that Robert would work in Tehachapi the following day. On August 17, 2014, Hearn drove on his motorcycle to Tehachapi from Hesperia, California, where he lived. It was about a two-hour drive from Hesperia to Tehachapi. Hearn confronted Robert inside the BNSF shop in Tehachapi. He shot Robert twice at close range with a handgun.

A coworker coming to relieve Robert from his shift discovered Robert's lifeless body and called 911. Law enforcement was dispatched to the scene at approximately 6:47 p.m. on August 17, 2014.[9]

Law enforcement obtained surveillance footage from cameras in the area, and a potential suspect was identified. This suspect was recorded driving a motorcycle on a road in the area at around 4:15 p.m. and 4:21 p.m. This suspect was seen walking near the BNSF shop at about 5:21 p.m. and leaving that area on foot at around 5:38 p.m. The suspect was recorded driving his motorcycle at about 5:48 p.m. on a road leading away from this area. It was impossible for law enforcement to identify the suspect from the surveillance footage.

---

[8] Appellant concedes in her opening brief that she told Hearn the "general location" of Robert's workplace in Tehachapi. Appellant also concedes that she told Hearn that Robert would be working there during the day on August 17, 2014.

[9] Robert was likely killed sometime after 5:00 p.m. Another BNSF employee saw Robert that day working on a train that had experienced a mechanical problem while in route through the Tehachapi area. The other worker briefly spoke with Robert sometime between 4:00 p.m. and 5:00 p.m. that day. It is apparent that Robert drove back to the Tehachapi shop after working on this train.

## V. Appellant Hides Her Affair From Law Enforcement.

Appellant repeatedly lied to law enforcement about her relationship with Hearn. On the night of Robert's murder, she falsely told Detective Robert Meyer that she was not having an affair. She continued this lie in subsequent interviews with various law enforcement officials, denying any infidelity on her part or having a boyfriend.[10]

## VI. The Phone Records before and after the Day of the Murder.

In the two weeks leading up to this murder on August 17, 2014, phone records show that appellant and Hearn often communicated. From August 1 through August 13, 2014, they exchanged 1,605 text messages. From August 14 through August 15, 2014, they exchanged 204 text and multimedia messages. On August 16, 2014, they exchanged 93 text messages.

Phone records show that appellant and Hearn spoke to each other multiple times on the telephone on the day of Robert's murder. Between about 6:30 a.m. and 8:10 a.m., Hearn called appellant's burner phone three times, totaling about 36 minutes. At 8:11 a.m. Hearn called appellant and they spoke for about 33 minutes. At 8:47 a.m., Hearn called appellant and they spoke for about 46 minutes. At about 10:07 a.m., they had a 19-minute call. At about 12:05 p.m., appellant called Hearn, and they spoke for about 80 minutes.

Hearn claimed to the jury that appellant had known he was going to drive to Tehachapi that day to confront Robert. He claimed that they had discussed how he had altered his motorcycle to avoid detection, and she had told him to be careful because Robert would likely put up a fight. In contrast, appellant told the jury that, when she spoke with Hearn that morning, he never said he was going to kill her husband. She denied discussing killing Robert or knowing about his plan. Appellant testified that it was "nothing out of the ordinary" to speak with Hearn this much on the telephone.

---

**10** Appellant also lied to law enforcement officials multiple times about the status of her marriage. She denied having an open marriage.

On the day of Robert's murder, phone records show that text messages were sent between appellant's burner phone and Hearn's cell phone at various times, including at 1:26 p.m., 4:22 p.m., 5:01 p.m., 5:04 p.m., and 6:57 p.m. Two text messages were sent from Hearn to appellant's burner cell at 7:50 p.m. At about 7:50 p.m., appellant called Hearn. From 7:50 p.m. to 8:37 p.m., they exchanged four text messages. At 8:37 p.m. Hearn called appellant's burner phone. From 8:38 p.m. on the night of Robert's murder, until 6:48 a.m. the following morning, appellant and Hearn exchanged 56 text messages.

In the days following Robert's murder, appellant and Hearn remained in contact. On August 18, 2014, appellant and Hearn exchanged approximately 97 text messages. From August 19 to August 22, 2014, they exchanged about 312 text messages, with one multimedia text. On August 21, 2014, they spoke on the phone for about 134 minutes. From August 23 to August 27, 2014, they exchanged about 307 text and multimedia messages. On August 28, 2014, they exchanged 55 text messages. On August 29, 2014, they exchanged 53 text messages. On August 30, 2014, they exchanged 30 text messages. On August 31, 2014, they exchanged 95 text messages.

In total, appellant and Hearn exchanged about 2,493 text and multimedia messages from August 1 to August 31, 2014. During that same time span, they had about 120 telephone calls.

## VII.   The Wiretaps and Police Surveillance.

About two weeks after Robert's murder, law enforcement was alerted by certain individuals about Hearn's involvement in appellant's life. These individuals were a couple with whom appellant and Robert had engaged in sexual activities. Law enforcement began to focus on Hearn, subpoenaing his cell phone records on or about August 29, 2014. In or around the first week of November 2014, law enforcement began a wiretap operation to monitor appellant's and Hearn's communications. Law

enforcement also surveilled them. Through the surveillance, law enforcement believed that appellant and Hearn were in a relationship.

Law enforcement recorded numerous conversations between appellant and Hearn, and some of the recordings were played at trial. During some conversations, appellant made statements that could be interpreted as showing she was happy that law enforcement had not identified anyone through deoxyribonucleic acid (DNA) testing, and she was pleased that law enforcement was not making significant progress in identifying the suspect.

During a conversation recorded on November 11, 2014, Hearn told appellant that DNA could be "the thing that sets us free. That is the thing that shows that we're not involved, you know? That could be the thing." Appellant responded, "Yeah—yeah—yeah." A short time later, Hearn commented that it felt like law enforcement might use the DNA as leverage. According to Hearn, it felt like Meyer "looked at phone records and realized we're in an affair and now [he] wants to just like bully you into saying that we're involved with that part you know with a … with a murder now." Appellant said, "Right." Still later, appellant asked Hearn whether law enforcement could publicize their affair. Hearn believed it could be publicized if it was tied to this crime. Appellant noted that if it was true about the DNA, "then that is our saving—that's right there, you know? It's like okay good, you know?"

During a call recorded on November 13, 2014, appellant and Hearn discussed what they believed to be law enforcement's progress on the DNA analysis of two sweat drops allegedly recovered from the murder scene. Appellant relayed to Hearn her understanding that the source of one drop had been identified as "a railroad guy," while the source of the other one had not been identified. Appellant described law enforcement's inability to identify the source of the other drop as "a good thing."

At times, both appellant and Hearn expressed concern that law enforcement might be listening in on their conversations or watching them. Hearn expressed paranoia to

9.

appellant that law enforcement might discover his secret relationship with her. On one occasion, Hearn called appellant using an internet service provider rather than his real cell phone number in an attempt to see if law enforcement was monitoring their conversations.

Appellant consistently kept Hearn apprised on how the investigation was proceeding. She often called Hearn just after speaking with Meyer, or in anticipation of meeting with Meyer. On occasion, Hearn would advise appellant on what she should say when meeting with Meyer. During one recorded call, Hearn prayed with appellant for her to "have the right words" when speaking with Meyer about the investigation. Hearn and appellant prayed for appellant "to not give too much information that needs to be shared."

On November 17, 2014, Meyer told appellant that, based on some surveillance footage, it appeared that the suspect was "a white male" who was skinny and riding a motorcycle. The suspect was possibly named "Jon, J-O-N" and possibly knew Robert. Meyer asked appellant if she had any pertinent information to share, or knew how law enforcement should proceed. Instead of informing law enforcement about Hearn, appellant gave Meyer the name of two males named "John" who had worked with Robert. At trial, the prosecution established that neither of these males matched the description of the suspect that Meyer had given to appellant.

Almost immediately after having this conversation with Meyer regarding the potential suspect, appellant called Hearn and asked him to call her from his station phone.[11] He called her back, and she told him about the phone call with Meyer. Hearn said it sounded like someone was trying to frame them. He prayed with appellant, asking for God's help and expressing concern that someone was trying to frame him because of his affair.

---

[11] Hearn worked as a firefighter.

On November 18, 2014, Hearn informed appellant that he had talked to some lawyers that morning. She agreed to help him with money for a legal retainer.

## VIII. Appellant is Arrested.

Law enforcement arrested appellant on November 18, 2014.[12] After her arrest, appellant finally admitted to law enforcement about her relationship with Hearn. She said she had kept the affair hidden because she was "ashamed."

After her arrest, appellant initially told law enforcement that she did not believe Hearn had killed Robert. She did not believe Hearn was capable of murder. In subsequent interviews, however, she eventually admitted that she had known "[s]hortly" after this murder that Hearn had "possibly" done it. When asked why she had not informed law enforcement if she had known Hearn was responsible, appellant responded that she had not wanted it "to be true." She later admitted that, as of November 9, 2014, she had known Hearn had killed Robert.

Appellant agreed that Hearn had coached her regarding what to say to law enforcement. She agreed that she thought Hearn was concealing their affair because it would point to him. She was asked again how soon after Robert's death had she known Hearn had done it. She answered, "Within … not that long." When pressed on a time frame, she said it was "pretty quick."

## IX. Appellant Is Released From Custody in November 2014 and Charges were Filed Against Her in January 2017.

On or about November 20, 2014, law enforcement released appellant from custody. No charges were filed against her at that time. Subsequently, however, Hearn reached a deal with the prosecution to testify against her. Charges were filed against appellant in January 2017.

---

[12]     Hearn was separately arrested that same day.

11.

## X.    Appellant's Trial Testimony.

At trial, appellant denied discussing with Hearn that Robert should be killed. She claimed that Hearn had acted alone and she had no knowledge that Hearn was going to kill Robert.

Appellant said she started a relationship with Hearn because of what was lacking in her marriage. Hearn would talk about God with her and pray, and she began to question her past lifestyle. She told the jury that her relationship with Hearn was "very spiritually based." She had wanted to try counseling with Robert, but he did not agree. She had discussed with Hearn her possibility of leaving Robert. However, she told the jury that she never really considered leaving Robert, and she had just been fantasizing.

Appellant admitted that at some point she had told Hearn about Robert's workplace in Tehachapi. She could not recall why she had told Hearn that information. She told the jury that she gave Hearn "bits and pieces" over time regarding Robert's shop in Tehachapi. She "possibly" gave him a description of the shop, but she denied giving a layout of it.

Appellant told the jury that she had loved both men. She admitted to the jury that she had lied to Meyer about having an affair when Meyer had called her in the hours after Robert's death. She told the jury that she was "embarrassed" about the affair, and she did not want it exposed. She claimed that Hearn had told her that the affair would cast suspicion on either him or both of them. She testified that she had wanted Robert's murder to be solved, and she wished she had done things differently. She had been trying to protect her image, and she had never wanted to believe that Hearn was responsible for the murder.

Appellant testified that she had not believed Hearn was capable of murdering Robert. She claimed she would not have been in a relationship with Hearn if she knew he had killed Robert. However, she admitted that, in her final interview with detectives, she

12.

believed Hearn had killed Robert. She told the jury that she made that admission because she believed that was what law enforcement had wanted to hear.

## DISCUSSION

We address the issues on appeal in the order that they are raised in appellant's opening brief. Before we address appellant's claims, we rule on her request for judicial notice, which we deny.

### I. We Deny Appellant's Request for Judicial Notice.

On August 30, 2021, appellant filed a request for judicial notice in this court regarding the file in *People v. Jonathan Hearn*, Kern County Superior Court case No. BF158339A. Appellant did not provide this court with a certified copy of this file. Although respondent was given an opportunity to file an objection to this request, it did not do so.

Judicial notice is proper regarding the records from any court in California. (Evid. Code, § 452, subd. (d)(1).) An appellate court, however, will normally not grant such a request for judicial notice unless the requesting party provides certified copies. (*Ross v. Creel Printing & Publishing Co.* (2002) 100 Cal.App.4th 736, 743; *People v. Meza* (1984) 162 Cal.App.3d 25, 33; *People v. Preslie* (1977) 70 Cal.App.3d 486, 495.) Although exceptions may exist, the requesting party has the burden to show good cause for not furnishing certified copies. (*Ross v. Creel Printing & Publishing Co.*, *supra*, 100 Cal.App.4th at p. 743; *People v. Preslie*, *supra*, 70 Cal.App.3d at p. 495, fn. 8.)

We have not been provided with any records, let alone certified copies, from the file of Hearn's criminal matter in the superior court. Appellant does not explain why a copy of this file was not furnished. We cannot notice records which we do not possess and cannot review. Accordingly, appellant's request for judicial notice is denied.

13.

**II.    Appellant Has Forfeited Her Claim that the Trial Court Erred in Denying a Motion for Judgment of Acquittal; in any Event this Claim Fails on its Merits Because Hearn's Accomplice Testimony Was Sufficiently Corroborated.**

Appellant contends that nothing corroborated Hearn's accomplice testimony that she solicited, conspired and aided in Robert's murder.[13]  She seeks reversal of her convictions for murder (count 1), conspiracy (count 2) and solicitation (count 3).

### A.    Background.

At the close of the prosecution's case-in-chief, the defense moved for a judgment of acquittal (§ 1118.1) as to all counts.  The motion was deferred until the close of the defense case.  When the motion was heard, defense counsel stated that the motion was only addressing count 5, which charged appellant with willfully mingling a poison with food (§ 347, subd. (a)(1)).  The court denied the motion, determining the jury should consider the charge in count 5.  The minute order reflects that the motion pursuant to section 1118.1 was heard and denied only as to count 5.

### B.    Analysis.

Appellant contends that the trial court erred when it denied her motion for judgment of acquittal regarding count 1 (murder), count 2 (conspiracy) and count 3 (solicitation).  She maintains that, when Hearn's testimony is eliminated, nothing tends to connect her to the charges of murder, conspiracy, or solicitation.  She asserts that she must be acquitted in counts 1, 2 and 3, and retrial is barred.  We disagree.

---

**13**    With CALCRIM No. 335, the jury was instructed to treat Hearn as an accomplice for all of the charged crimes.  An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)  Respondent correctly notes that Hearn is not an accomplice to the solicitation charged in count 3.  However, the statute under which count 3 was charged has its own corroboration provision.  (§ 653f, subd. (g).)  Thus, respondent concedes that the alleged deficiency in corroboration for the solicitation charge in count 3 must nevertheless be addressed.  We note that the jury was correctly instructed with CALCRIM No. 441 regarding the corroboration requirement specifically for the solicitation charge.

As an initial matter, appellant has forfeited this claim. In any event, we conclude that the trial court did not err in denying the motion for acquittal because Hearn's accomplice testimony was sufficiently corroborated.

### 1. *This claim is forfeited.*

When this motion was argued below, defense counsel informed the trial court to only address count 5, which charged appellant with willfully mingling a poison with food (§ 347, subd. (a)(1)). As a result, the court did not analyze the remaining charges when it denied the motion.

Appellant argues that this claim should not be deemed forfeited. According to appellant, the motion was made in a timely manner as to all counts, and the court was required by section 1118.1 to grant a judgment of acquittal as to counts 1, 2 and 3 because the evidence was insufficient as a matter of law to sustain those charges. In the alternative, appellant raises ineffective assistance of counsel.

Respondent does not raise forfeiture. Instead, because appellant's motion for judgment of acquittal originally applied to all counts, respondent takes the position it is appropriate to review the merits of this claim.

We disagree with both parties and we determine that this claim is forfeited. In general, a defendant is not required to articulate specific grounds in a motion for acquittal. (*People v. Cole* (2004) 33 Cal.4th 1158, 1213; *People v. Belton* (1979) 23 Cal.3d 516, 521–522.) However, when a defendant directs his acquittal motion only to specific counts or enhancements, the trial court may limit its attention to the evidence bearing on the counts or enhancements specified in the motion, and need not test every charge and allegation for sufficient evidentiary support. (*People v. Goss* (1992) 7 Cal.App.4th 702, 707; *People v. Ceja* (1988) 205 Cal.App.3d 1296, 1303–1304.)

Here, although the acquittal motion originally applied to all counts, defense counsel specifically directed the court to consider only the charge in count 5. As such,

15.

the claim that appellant now raises on appeal must be deemed forfeited. She focused the court away from analyzing the sufficiency of the evidence as to the charges in counts 1, 2 and 3. Thus, she cannot argue that the court erred in failing to conduct an analysis it was not asked to conduct. (See *People v. Partida* (2005) 37 Cal.4th 428, 435.) Accordingly, this claim is deemed forfeited. In any event, however, we also conclude that this claim fails on its merits.[14]

### 2. *The trial court did not err.*

Despite asking the trial court to focus on count 5 when the motion for judgment of acquittal was argued below, appellant contends that the court should have granted the motion for counts 1, 2 and 3 as a matter of law. According to appellant, Hearn's testimony was not sufficiently corroborated to support those charges. We disagree.

The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction. (*People v. Huggins* (1997) 51 Cal.App.4th 1654, 1656.) The question is whether substantial evidence exists for each element of the charged offense. (*Ibid.*) We independently review a trial court's ruling under section 1118.1. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1213.) A motion under section 1118.1 made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

We review de novo whether an accomplice's testimony was sufficiently corroborated. (*People v. Pedroza* (2014) 231 Cal.App.4th 635, 650.) Such evidence

---

**14** Because we also address and reject this claim on its merits, we need not address any alleged ineffective assistance of counsel because appellant cannot show she was prejudiced by her trial counsel's performance. (See *People v. Holt* (1997) 15 Cal.4th 619, 703 [defendant not entitled to relief on claim of ineffective assistance of counsel where he made insufficient showing as to prejudice].)

must tend to connect the defendant with the commission of the offense, but it does not need to corroborate every fact to which the accomplice testified. (§ 1111; *People v. Perez* (2018) 4 Cal.5th 421, 452.) Corroborating evidence may be circumstantial or slight, and it is entitled to little consideration when standing alone. (*People v. Perez*, *supra*, 4 Cal.5th at p. 452.) "The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) The evidence must be viewed in the light most favorable to the judgment, and witness credibility is not considered. (*People v. Pedroza*, *supra*, 231 Cal.App.4th at p. 650.)

To show a lack of corroboration, appellant relies on *People v. Braun* (1939) 31 Cal.App.2d 593 (*Braun*). This opinion does not assist her.

In *Braun*, the appellate court reversed the defendant's judgment due to insufficient corroboration of an accomplice's testimony. (*Braun*, *supra*, 31 Cal.App.2d at p. 605.) The defendant had associated with the actual perpetrators of the charged crimes, and the trial evidence had suggested that the defendant had had an opportunity to participate in those crimes. (*Id.* at p. 601.) According to the *Braun* court, however, these circumstances only raised a suspicion of guilt that the defendant had advised, encouraged and participated in the crimes. (*Ibid.*) When the accomplice's testimony was ignored, the remaining evidence did not provide substantial proof that the defendant "either advised or encouraged the commission of the robbery in question." (*Id.* at p. 602.)

Appellant contends that, similar to *Braun*, nothing shows that she advised or encouraged the commission of this murder apart from Hearn's testimony. We disagree. As we explain below, evidence connects appellant to this murder even when Hearn's testimony is not considered. *Braun* is distinguishable and it does not establish error.

17.

### a. Appellant is connected to this murder because she informed Hearn about Robert's unique work schedule.

It is undisputed that, at some point during their relationship, appellant told Hearn about Robert's general work location in Tehachapi. It is also undisputed that appellant learned on August 16, 2014, that Robert would work in Tehachapi the following day, and she gave this information to Hearn.[15] Robert rarely worked in Tehachapi and, when he did, he was alone.

These facts corroborate Hearn's testimony that appellant had knowledge of Hearn's plan to kill Robert, and that she encouraged Hearn to commit this murder. It was appellant who informed Hearn where Robert generally worked in Tehachapi and, critically, it was appellant who told Hearn about Robert's unexpected and previously unscheduled shift in Tehachapi on August 17, 2014. This information directly connects appellant to this crime because, without this information, Hearn would not have known he could drive about two hours to Tehachapi that day and confront Robert alone at his place of work. This evidence strongly suggests that Hearn was telling the truth.

We reject appellant's argument that we must find direct corroboration of her specific criminal intent. To the contrary, section 1111 requires that the testimony of an accomplice be corroborated by evidence that merely tends to connect the defendant with the commission of the offense. As such, we will not require more than what the statute expressly states. Because it is undisputed that appellant told Hearn where to find Robert, and she provided Hearn with information about Robert's change in work schedule, evidence apart from Hearn's testimony connected her to the commission of this murder.

Appellant focuses on an evidentiary conflict that existed regarding when Hearn learned that Robert would be working in Tehachapi on that fatal day. Hearn told the jury

---

[15] Appellant concedes in her opening brief that she told Hearn the "general location" of Robert's workplace in Tehachapi. Appellant also concedes that she told Hearn that Robert would be working there during the day on August 17, 2014.

18.

that he had known *one or two weeks earlier* that Robert would be working in Tehachapi on the day that he killed Robert. As appellant notes, however, Hearn's recollection in this regard was impeached at trial. It is undisputed that Robert was asked to cover this shift the day before. As a result, Hearn must have learned about Robert's unexpected shift in Tehachapi no earlier than the day before this murder took place.

Appellant suggests that, because of this evidentiary discrepancy, corroboration cannot exist. Appellant acknowledges that this court cannot reweigh credibility, but she argues that we should reject those portions of Hearn's testimony where "he shifted blame for the murder to appellant." She contends that his testimony is highly suspicious and designed to save himself.

Appellant's arguments are unpersuasive. Although Hearn's recollection at trial in this regard was clearly erroneous, that does not alter our conclusion that sufficient corroboration occurred. Regardless of Hearn's inability to recall accurately when he was told that Robert would be working in Tehachapi on August 17, 2014, it is overwhelmingly apparent it was appellant who provided Hearn with this information. Thus, sufficient corroboration exists because it was clearly appellant who informed Hearn about Robert's new and unique work schedule. Therefore, evidence exists apart from Hearn's testimony which directly connects appellant to Robert's murder.

Finally, appellant disputes the significance of the fact that she told Hearn the general location of Robert's worksite in Tehachapi. Some trial evidence suggested it was very difficult to find this shop because it was not prominently marked. This worksite was an industrial shop within a series of commercial buildings. Most of the other shops were also not marked.[16]

---

**16** Hearn testified that, in May 2014, he went on a scouting trip to Tehachapi in an effort to find the BNSF facility. At trial, he claimed that he informed appellant during a telephone call that he was searching for Robert's worksite that day. During this scouting trip in May 2014, Hearn located the BNSF facility and took photographs of it with his cell phone. Hearn told the jury that, while he was driving home that day, he told

19.

Appellant argues that the BNSF shop's location in Tehachapi can be easily found on the Internet.[17]  This argument does not alter our conclusion that sufficient corroboration exists.  Regardless of whether or not Hearn could have found the shop without appellant's assistance, it is undisputed that she did inform Hearn of the shop's general location, and she gave Hearn the critical information that Robert would be working there on August 17, 2014.  Her decision to provide this information connects her to the charges of murder (count 1); conspiracy to commit murder (count 2); and solicitation for this murder (count 3).  As we discuss below, however, this is not the only evidence that provides corroboration of Hearn's accomplice testimony.  The totality of the circumstances surrounding appellant's actions, along with evidence of her motive for Robert's death, further support a finding of corroboration.

### b.  The totality of the circumstances supports a finding of corroboration.

Appellant's overall conduct and her relationship with Hearn may be considered when examining whether corroboration exists.  (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32.)  The totality of appellant's conduct and her relationship with Hearn provides additional corroboration connecting her to the murder.

Appellant repeatedly lied to law enforcement.  She was asked multiple times if she was having an affair, and she consistently failed to disclose her relationship with Hearn until she was arrested in November 2014.  As appellant concedes, her lies reasonably suggest a consciousness of guilt.  When coupled with the information that she provided to

---

appellant he had located Robert's workplace in Tehachapi.  Appellant argues in her opening brief that nothing independently connects her with this particular testimony and evidence.  We agree with appellant in that regard.  No independent evidence links appellant to Hearn's scouting trip in May 2014.

[17]     Appellant has not asked this court to take judicial notice of this information. Accordingly, we make no findings in this regard.

Hearn regarding where and when to find Robert, a reasonable inference may be drawn that appellant had an intent to kill.

During a recorded interview after she was arrested, Meyer expressed concern to appellant about how Robert must have felt when Hearn suddenly appeared at his workplace with a gun. In response to Meyer's statements, appellant replied that she had "just wanted to know if he suffered. And, he said he didn't suffer."

Respondent contends that appellant's response to Meyer shows, or at least suggests, that she had talked to Hearn about this murder.[18] In contrast, appellant asserts that her statement to Meyer is open to various interpretations and it does not necessarily indicate that she knew in advance that Robert's murder would occur. Although appellant's statement is subject to different interpretations, a reasonable inference may be drawn from it that appellant had talked to Hearn about the manner of Robert's death. When coupled with other evidence in this record, appellant's statement about knowing that Robert did not suffer strongly suggests she was part of a plot to commit this murder.

Other examples exist. Before she was arrested, law enforcement began to surveil both Hearn and appellant. A wiretap operation was started to monitor their communications. Law enforcement recorded numerous conversations, and some of the recordings were played at trial. During a conversation recorded on November 11, 2014, Hearn told appellant that DNA could be "the thing that sets us free. That is the thing that shows that we're not involved, you know? That could be the thing." Appellant responded, "Yeah—yeah—yeah." A short time later, Hearn commented that it felt like law enforcement might use the DNA as leverage. According to Hearn, it felt like Meyer "looked at phone records and realized we're in an affair and now [he] wants to just like bully you into saying that we're involved with that part you know with a … with a murder now." Appellant said, "Right." Still later, appellant asked Hearn whether law

---

**18** Meyer did not ask appellant what she had meant.

21.

enforcement could publicize their affair. Hearn believed it could be publicized if it was tied to this crime. Appellant noted that if it was true about the DNA, "then that is our saving—that's right there, you know? It's like okay good, you know?"

During a call recorded on November 13, 2014, appellant and Hearn discussed the DNA analysis of two sweat drops allegedly recovered from the murder scene. Appellant believed one drop had been identified as "a railroad guy," while the source of the other one had not been identified. Appellant described law enforcement's inability to identify the source of the other drop as "a good thing."

In a different exchange, Meyer told appellant that they had received a secret witness tip that they should focus on a skinny white male named "Jon, J-O-N" who drove a motorcycle and possibly knew Robert. Meyer asked appellant if she knew in which direction the investigation should proceed. Although Meyer's description matched Hearn, appellant did not name Hearn but, instead, named two former coworkers of Robert's who were named John. She then called Hearn and immediately told him to call her back from a different phone. Appellant later admitted to the police that she had done so because she was "thinking maybe someone was listening" to their calls.

These various recorded exchanges show that appellant was actively trying to conceal Hearn's identity from law enforcement. Coupled with appellant's lies and her disclosure to Hearn about where and when Robert was working in Tehachapi, reasonable inferences may be drawn that demonstrate appellant's intent to kill.

Finally, appellant admitted to detectives after she was in custody that she had known "pretty quick" after Robert's murder that Hearn had been responsible. The parties dispute whether or not this fact tends to corroborate Hearn's testimony that appellant intended for Robert to die. Appellant contends this only shows her knowledge of the murder at some point *after* it was committed. While it certainly establishes her knowledge after the fact, a reasonable inference may be drawn that she knew before Robert's murder that Hearn was going to shoot him. Indeed, the jury learned that, 19

22.

days after Robert's murder, she texted Hearn saying how sexy he was and she adored him. Two days later she again texted him, saying how much she loved and missed him. On another occasion 25 days after Robert's murder, she texted Hearn that she had bought him something "practical" that "will one day be something we share in our home." All of these examples provide sufficient grounds for the jury to draw a reasonable inference appellant had planned Robert's murder with Hearn. A jury could reasonably conclude from the totality of the evidence that appellant would not have remained in a romantic relationship with Hearn after Hearn's involvement in Robert's murder came to light unless she had conspired with Hearn from the inception.

### c. *Appellant had a motive for Robert's death.*

Evidence that a defendant had a motive to commit the charged crime can be used to corroborate an accomplice's testimony. (See *People v. Szeto* (1981) 29 Cal.3d 20, 28.) Here, the jury learned that appellant was not just having a physical affair with Hearn. Instead, she had intense feelings for him. Both before and after Robert's murder, she repeatedly expressed her love for him and her belief that they had a future together.

In February 2014, about six months before Robert was murdered, appellant gave Hearn a Valentine's Day card. She repeatedly wrote that she loved him, and she expressed how much he meant to her. She wrote that she loved him "for trusting me with your heart, your pride, your wisdom and soul." She also stated her love for him because she was the one "you choose to care for" and he had brought a "special meaning" to her life. She loved him "for hopes and faith in our future together." She concluded the card by stating she loved him "for so many reasons" and she had only written a few, "but in all that years bring to us, I never want you to forget that you were made for me, [and] I was made for you."

In another undated card, she again expressed her love for him. She wrote that he was her love, and he was her "amazing blessing that God has given me." She wrote that

she wanted to love him "in God's love and live together in God's will." She wrote that they had been blessed by God "to have this chance . . . To love each other." She wrote that she cherished his love and "the blessings" God had given them. She included a passage from the Bible describing God's love and the need to love one another.

As noted above, about 19 days after Robert's murder, appellant texted Hearn saying how sexy he was, she loved him, she adored him, and missed him. On another occasion 25 days after Robert's murder, she texted Hearn that she had bought him something they would one day share in their home.

From September 5 to September 12, 2014, appellant texted Hearn about 20 times, indicating that she loved him and missed him. On October 5, 2014, she texted Hearn that he was her "partner in this life to live for God. I'm so ready to live life fully with you. I WILL wait on God's time and trust in His plan. But I'm READY FOR US! I need you my Jonathan!!"

On October 18, 2014, she texted Hearn saying she loved him "[d]eeply" and it was a love that she had "never felt before." On November 1, 2014, she texted him about mundane tasks that she needed to accomplish. She finished her text asking how "the love of my life" was that morning.

On November 2, 2014, she texted Hearn telling him he was "such an amazing man of many God given gift's [*sic*] and talents. I feel overwhelmed by your know how, but I feel privileged to be able to be a part of you, and blessed to have your love in the many wonderful ways that I do. Thank you for giving me YOU. I cherish all of what I have with you Jonathan!"

After her arrest, appellant told Meyer that she would talk to Hearn about raising her children, and they talked about "how badly" things in her life "were being done." When speaking with other detectives, she denied feeling relieved that Robert was gone, but she admitted that she had started to build a future with Hearn. She was asked if that

24.

plan for a future was still true knowing that Hearn had killed Robert. She answered, "I just thought we were gonna [*sic*] uh, live under the Bible and live … live right."

In addition to showing appellant's love for Hearn, the prosecution introduced evidence that strongly suggested appellant was not happy in her marriage. She disclosed to law enforcement after her arrest that Robert was often "distracted" on Web sites and his phone, and, although they remained friends, he was "somewhere else" emotionally. She told Meyer that it was "just a crazy experience" when they first opened their relationship sexually with another couple. She told Meyer that opening their relationship had caused "troubles" but Robert had told her it was "just sexual." Appellant admitted to Meyer that she and Robert had allowed "some things" to come into their marriage that she felt had "damaged" them. She would tell Robert, but "he wouldn't hear of it." Appellant had discussed divorce with Robert stemming from the "partying and too much drinking" but everything would be "all good" the next day.

Finally, the prosecution established that appellant may have had a financial interest in Robert's death. Robert had a life insurance policy of $300,000. Per that policy, appellant received $300,591.70 in October 2014. Appellant also had an opportunity to receive a financial settlement with BNSF because Robert had died at work. In October 2014, appellant sought a "fair settlement" with BNSF.[19] As of this trial, however, no settlement was reached.[20]

### d.    Our conclusions.

Based on this record, the trial court did not err when it failed to grant the motion for judgment of acquittal regarding counts 1, 2 and 3. It was appellant who informed Hearn about Robert's unexpected extra shift in Tehachapi on August 17, 2014. Based on

---

[19]    Hearn claimed at trial that appellant had wanted a settlement with BNSF of around $1 million.

[20]    BNSF paid for Robert's funeral expenses up to $15,000. Appellant asked the company to donate any unused portion of that money to the church.

that critical information, Hearn was able to drive about two hours to confront Robert when he was alone. In addition, appellant repeatedly lied to law enforcement about her relationship with Hearn, and she provided some false leads regarding potential suspects. Moreover, some of her recorded conversations with Hearn strongly suggested she was happy that law enforcement had not discovered the killer. Based on a statement appellant made to Meyer, a strong inference exists that appellant had asked Hearn whether Robert had suffered when Hearn killed him. Finally, the prosecution established that appellant was deeply in love with Hearn both before and after he killed her husband. The jury had sufficient evidence to reasonably conclude that appellant would not have remained in a romantic relationship with Hearn unless she had conspired with Hearn from the inception. Setting aside Hearn's testimony, evidence from the prosecution's case overwhelmingly and conclusively connected appellant to this murder. Thus, sufficient corroboration of Hearn's testimony occurred.[21] Therefore, the court did not err in denying the motion for judgment of acquittal, and appellant's arguments are without merit. We will not reverse appellant's judgment based on an alleged failure to corroborate Hearn's accomplice testimony.

### III. Substantial Evidence Supports Appellant's Conviction for Solicitation in Count 3.

In count 3, appellant was charged with soliciting Hearn on or about and between March 19, 2014, and August 17, 2014, "to commit or join in the commission" of Robert's murder. The jury convicted appellant of this charge (§ 653f, subd. (b)).

Appellant argues that, if the trial court properly denied her motion for a judgment of acquittal as to count 3 and/or that claim was deemed forfeited, then reversal of this

---

[21] Because appellant's claim focuses on an alleged lack of corroboration, we do not address the elements needed to establish appellant's guilt for the charges alleged in counts 1, 2 and 3. In any event, we address those elements below when resolving appellant's claims that insufficient evidence supports these convictions.

26.

conviction is still warranted due to an absence of substantial evidence to establish that she requested or asked Hearn to kill Robert.

### A.    *Standard of review.*

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt.  The evidence must be reasonable, credible and of solid value.  We presume every inference in support of the judgment that the finder of fact could reasonably have made.  We do not reweigh the evidence or reevaluate witness credibility.  We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding.  (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

### B.    *Analysis.*

Appellant again contends that Hearn's accomplice testimony was not sufficiently corroborated.  She asserts that nothing independently shows that she solicited Hearn to kill Robert.  She also argues that Hearn's testimony failed to establish the elements of solicitation.  We disagree.  Hearn's testimony regarding the solicitation was sufficiently corroborated, and his testimony represents substantial evidence supporting the conviction in count 3.

The crime of solicitation for murder must be proven by the testimony of two witnesses, "or of one witness and corroborating circumstances."  (§ 653f, subd. (g).)  The purpose of section 653f is to guard against a conviction for solicitation "based on the testimony of one person who may have suspect motives." (*People v. Phillips* (1985) 41 Cal.3d 29, 76.)  The elements of solicitation are an offer or invitation to another to commit a crime, and the intent that the crime be committed.  (*People v. Wilson* (2005) 36 Cal.4th 309, 328.)  The crime of solicitation is complete as soon as the verbal request is

27.

made with the requisite intent, and is punishable regardless of the agreement of the person solicited or any overt act. (*Ibid.*)

In this case, Hearn's testimony and corroborating circumstances satisfy the requirements of section 653f, subdivision (g). We have already explained that the circumstances amply demonstrate appellant's involvement in Robert's murder.[22] She provided the key information to Hearn that permitted this killing to occur in Tehachapi while Robert was working alone. Further, the totality of the remaining record shows that she tried to hide her relationship with Hearn from law enforcement, and a strong inference may be drawn from the record that she knew in advance that Hearn was going to kill Robert. As such, the jury was permitted to consider Hearn's testimony in determining if the prosecution had established the crime of solicitation. (See *People v. Maldonado* (1999) 72 Cal.App.4th 588, 598 [once corroboration sufficiently establishes the accomplice's believability, the accomplice's testimony may establish many other facts not related in the independent testimony].)

Hearn told the jury that, during his affair with appellant, they had increasingly negative discussions about Robert. Towards the end of 2013 or the beginning of 2014, they began discussing Robert's demise. It was a "joke" at first. Hearn told the jury that he could not remember who had mentioned it first, but it turned into something that materialized. It would be "simpler" if Robert were gone. According to Hearn, he and appellant had "a plot to kill her husband." They planned to conceal their crime and then have a future together, including marriage. Hearn testified that divorce was not an appealing option for appellant. Hearn told the jury that, at some point while they were using the burner phone, appellant told him to kill Robert.

---

[22] The standard for corroboration under section 653f is the same as required under section 1111. Both statutes require sufficient independent evidence that tends to connect the defendant with the charged offense. (*People v. MacEwing* (1955) 45 Cal.2d 218, 223–224.)

Appellant argues that Hearn's testimony is insufficient to establish her solicitation for murder because he said they had *mutually discussed* Robert's demise. She also notes that, according to Hearn, she told him to kill Robert *after* the alleged poison plot had already ended and they had decided to halt their plans for three or four months. We reject these arguments. Regardless of when appellant told Hearn to kill Robert, Hearn made it clear that she asked or invited him to commit murder, and she intended for it to occur. (See CALCRIM No. 441.)[23]

Reviewing the record in the light most favorable to the judgment, substantial evidence exists from which a reasonable jury could make the necessary finding beyond a reasonable doubt that appellant was guilty in count 3. We will not reweigh the evidence or reevaluate witness credibility, and we cannot reverse the judgment merely because the evidence could be reconciled with contrary findings. The evidence in this record is reasonable, credible and of solid value. Therefore, appellant's arguments are without merit and reversal of count 3 is not appropriate.

## IV. Substantial Evidence Supports Appellant's Conviction for Conspiracy in Count 2.

In count 2, appellant was charged with conspiring with Hearn to commit murder on or about and between March 19, 2014, and November 18, 2014. The jury convicted appellant of this charge (§ 182, subd. (a)(1)).

Appellant again contends that Hearn's accomplice testimony was not properly corroborated. She argues that the evidence was insufficient to establish two elements of the charged conspiracy: (1) that she intended to agree and did agree with Hearn to kill Robert; and (2) that she intended that Hearn would intentionally and unlawfully kill. She

---

[23] The jury was instructed with CALCRIM No. 441, and told that appellant was guilty of solicitation if the prosecution proved the following: (1) appellant requested or asked or invited another person to commit or join in the commission of the crime of murder; and (2) appellant intended that the crime of murder be committed.

asserts that none of the overt acts which the jury found true evidenced her intent to kill. She claims that Hearn was the "mastermind" of the plot to murder Robert, and Hearn exercised control over her. She maintains that, if the trial court properly denied her motion for a judgment of acquittal as to count 2 and/or that claim was deemed forfeited, then reversal of this conviction is still warranted due to an absence of substantial evidence to establish the elements of conspiracy. We disagree.

A criminal conspiracy exists where there is an unlawful agreement between two or more people to commit a crime, and an overt act occurs in furtherance of that agreement. (§ 182, subd. (a)(1); *People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399.) Conspiracy is a specific intent crime, with the intent divided into two elements: (1) the intent to agree or conspire, and (2) the intent to commit the offense which is the object of the conspiracy. (*People v. Martin* (1982) 135 Cal.App.3d 710, 722.) There must be substantial evidence to show the conspirators not only intended to agree but also intended to commit the elements of the target offense. (*People v. Prevost*, *supra*, 60 Cal.App.4th at p. 1399.)

In this matter, the jury found true certain overt acts in support of this conspiracy, including that (1) Hearn purchased a cellular phone to escape law enforcement detection; (2) appellant used that cellular phone; (3) appellant provided information to Hearn regarding the BNSF shop location in Tehachapi; (4) appellant informed Hearn that Robert would be working in Tehachapi on August 17, 2014; and (5) Hearn shot and killed Robert on August 17, 2014.

Ample evidence from this record supports these findings, and, from them, a reasonable inference exists that appellant intended for Hearn to kill Robert, and they intended to hide their conspiracy from law enforcement. Appellant, however, asserts that other interpretations may be drawn from the evidence. She argues that she merely used the burner phone to prevent Robert from finding out about her continuing affair. She also contends that she told Hearn about Robert's work schedule so she could facilitate her affair and spend time with Hearn. She concedes that, by informing Hearn about Robert's

30.

work schedule, she "clearly aided" Hearn in carrying out *his* plan of killing Robert. However, she maintains that her "verbal acts" are insufficient to prove her intent to conspire or her intent to kill.

Appellant's various arguments are unpersuasive. Direct evidence of a defendant's intent to kill rarely exists. Thus, such intent "may be inferred from the circumstances of the crime and the defendant's acts." (*People v. Sánchez* (2016) 63 Cal.4th 411, 457.) Appellant's actions in this matter, coupled with the circumstances of the crime, sufficiently support the jury's determination that appellant held an intent to conspire with Hearn, and she intended for Hearn to kill Robert. The jurors had the exclusive role to judge all questions of fact submitted to them, including the credibility of the witnesses. (See CALCRIM No. 226; § 1127.) It is clear that the jury resolved the various credibility disputes unfavorably for appellant. Although appellant can point to other interpretations that may be drawn from the record, substantial evidence exists from which a reasonable jury could have decided beyond any reasonable doubt that appellant was guilty of conspiring with Hearn to kill Robert.

Finally, appellant asserts that, during closing arguments, the prosecutor focused on her actions *after* the date of the murder when asking the jury to find her guilty of conspiracy. She contends that the prosecutor likely did this because there was no evidence (aside from Hearn's testimony) to establish her intent to conspire before the murder occurred. We disagree. Regardless of how the prosecutor argued this issue to the jury, overwhelming evidence exists in this record that appellant agreed with Hearn to kill Robert, and she intended that Hearn would intentionally and unlawfully kill. We will not reverse the judgment merely because the evidence can be reconciled with contrary findings. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.) Substantial evidence supports the conviction for conspiracy, and this claim fails.

**V. Substantial Evidence Supports Appellant's Conviction in Count 1 for Murder.**

Based on a theory of aiding and abetting, the jury convicted appellant of first degree premeditated murder in count 1. With CALCRIM No. 401, the jury was instructed on the doctrine of aiding and abetting. The jurors were told that appellant was guilty of a crime if (1) Hearn committed a crime; (2) appellant knew that Hearn had intended to commit the crime; (3) before or during the commission of the crime, appellant intended to aid and abet Hearn in committing the crime; and (4) appellant's words or conduct did, in fact, aid and abet Hearn's commission of the crime.

Appellant concedes that the jury was "properly instructed" with CALCRIM No. 401 regarding liability under a theory of aiding and abetting. She argues, however, that her murder conviction must be reversed due to insufficient evidence. She contends that the prosecution failed to prove that she knew Hearn intended to commit the murder and/or that she intended to aid and abet Hearn in committing the crime. She again argues that Hearn's testimony was not sufficiently corroborated. These arguments are unpersuasive.

We have already concluded that sufficient evidence corroborated Hearn's accomplice testimony that appellant intended to kill Robert. Therefore, the jurors were free to consider Hearn's testimony and give it whatever weight they felt appropriate. The jurors had the exclusive role to judge all questions of fact submitted to them, including Hearn's credibility. (See § 1127.) Based on the verdict rendered in count 1, it is clear that the jury found portions of Hearn's testimony credible, and it rejected appellant's testimony that she had not intended to aid Hearn in committing murder. We will not disturb the jury's verdict because substantial evidence supports it.

Hearn informed the jury that appellant told him to kill Robert. Appellant provided the key information to Hearn that permitted him to find Robert alone in Tehachapi and kill him. The record amply supports the jury's determination that appellant knew that

32.

Hearn intended to kill Robert, and she intended to aid and abet Hearn in committing this murder. This evidence was reasonable, credible and of solid value. Therefore, substantial evidence supports the conviction in count 1, and this claim fails.

**VI.    Appellant has Forfeited her Claim that her Constitutional Rights were Violated Based on the Media Coverage; This Claim also Fails on its Merits.**

This trial received extensive local and national news coverage. The trial was broadcast live on the Internet.[24] Appellant argues that she did not receive a fair trial by an impartial jury. She contends that her due process rights were violated.

### A.    Background.

We summarize the relevant history regarding the media coverage in this case, and the admonishments that the trial court gave throughout the proceedings.

### 1.    The court grants media access.

In August 2017, before the jury was selected, the defense objected to any media coverage and livestreaming of the trial. The trial court granted media requests allowing a television camera to broadcast the trial live. In September 2017, before the jury was selected, the court and counsel spoke to an NBC technical crew about how to place the recording equipment and cables strategically in the courtroom "to be unobtrusive and not create any distractions or hazards."

### 2.    The admonishments during voir dire.

During voir dire, prospective jurors were asked whether or not they had "seen, read or heard anything" about this case. Prospective jurors with media exposure to the case were individually questioned away from the other potential jurors, and some of these individuals were dismissed for cause or by stipulation.

One prospective juror indicated he had first heard about the case on the television in the jury assembly room. A story aired for about two minutes discussing the charges

---

[24]    This trial is still viewable on the Internet. (<https://lawandcrime.com/live-trials/live-trials-current/sabrinalimon/watch-live-sabrina-limon-trial/> [as of Oct. 14, 2022].)

against appellant. This prospective juror informed the court that he thought appellant was "guilty" because she was linked with Hearn. This prospective juror said he did not know if he could make his own decision based on the evidence and the law. The parties stipulated to excuse this person from service.

Another prospective juror saw a news story about this case, and he then saw the same news story air on the television in the jury assembly room. This prospective juror thought he could still be fair. The defense later exercised a peremptory challenge for this individual.

During voir dire on August 31, 2017, the trial court admonished the potential jurors, in part, that they were not allowed "to read or listen to any media coverage, if there is any. [¶] You are to base your decision only on the evidence you hear in court and only after the case has been submitted to you for deliberation." The court told the potential jurors to "change the channel" if they were watching television "and something about this case" was aired. The jurors were told to not read anything appearing in a newspaper or on the Internet about this case.

On the morning of September 6, 2017, still during voir dire, the court again admonished the group of prospective jurors, in part, that they could not "read or listen to any media coverage. You are to base your decision only on the evidence you hear in court and only after the case has been submitted to you for deliberation." That same afternoon the court admonished the prospective jurors as the proceedings concluded for the day that they were "not to read, watch, listen [to] anything about this case. Okay? [¶] If it's on the TV, turn the channel. If it's on the radio, turn the channel. If it's on the Internet, flick the button. Do something. Don't read or watch anything about this case. All right?"

### 3. *The admonishments to the sworn jury.*

On September 8, 2017, the alternate jurors were sworn and the jury panel was complete. The court informed the jurors that a video camera and a still camera would be in the courtroom each day. Jurors were informed that they would not be photographed, and the media had been ordered not to conduct any interviews near them "or do anything around you." The court admonished the jurors that it was "imperative that you not read, watch, or listen to anything about this case. [¶] The actual evidence is what you get here in court, not some reporter's viewpoint of what they think it is. Okay? [¶] It's what you get here in court. All right? [¶] So please don't violate that order. If you see something, turn the channel, turn off the radio. If you're on the Internet, go to ESPN. I don't think that will be on there. Okay?" A short time later, the court informed the jurors that live coverage of this trial would probably happen. The court told the jurors to "stay away" from any platform that might show this trial, and the court reiterated that the jurors should not expose themselves "to anything that is not presented to you in this court." The judge stated that the court and the parties were "[v]ery concerned" about this issue.

The jury began to hear evidence in this matter on September 11, 2017. Just before the first witness testified, the court admonished the jurors that their verdict must be based only on the evidence presented during this trial. The court cautioned the jurors to "not read, listen to, or watch any news report or commentary about the case from any source."

At the end of the day on September 14, 2017, the court cautioned the jurors that they could not "read, watch, listen to any news report or any media coverage of this case whatsoever. All right?"

At the end of the day on September 15, 2017, the court reminded the jurors "not to form or express any opinion or discuss the case. Don't read, watch, or listen to any news media of this case."

At the end of the day on September 22, 2017, the court told the jurors to not "form or express any opinion, nor discuss the case. [¶] Remember not to read, watch, or listen to any media coverage."

On October 2, 2017, the defense rested and the prosecution announced it had no rebuttal evidence. The court informed the jurors that the attorneys would give their closing arguments the next day, and the jurors would then have the case. The jurors were excused for the day. Before leaving, the court reminded them to not "form or express any opinion or discuss the case. Don't watch any media coverage."

### 4. *The relevant jury instructions.*

On October 3, 2017, the court instructed the jury on the law. With CALCRIM No. 124, the jurors were informed that they could not conduct any research. The jurors were also told to not use any form of electronic or wireless communication to obtain information.

With CALCRIM No. 200, the jurors were told that they must decide the facts, and that decision could only be based on the evidence presented to them at trial.

With CALCRIM No. 201, the court instructed the jurors to not use the Internet or other reference materials in any way in connection with this case, either individually or as a group. The jurors were told to not investigate the facts of this case, either individually or as a group.

### B. *Analysis.*

Appellant asserts that the trial court erred by failing to take adequate measures to protect her constitutional rights to a fair trial by an impartial jury. She notes that, during voir dire, a number of potential jurors indicated that they had read about this case and/or had seen photos related to the case on social media. She contends that the court failed to admonish the jurors sufficiently to avoid media coverage.[25] She argues that, given the

---

[25] Appellant argues that, between opening statements and the end of closing arguments, the court admonished the jury 55 times to not form an opinion or discuss the

pervasiveness of the media in today's digital age, it would have been difficult, if not impossible, for even a diligent juror to have avoided exposure to this trial. She maintains that, once this trial started, jurors may have revisited testimony at their leisure away from court. Appellant also claims that the court failed to ensure that witnesses did not watch live or recorded trial proceedings before they testified. She asserts it is likely witnesses may have viewed portions of the trial before testifying, and/or witnesses did not give truthful testimony because they were "performing for the camera."

We reject appellant's various arguments. We agree with respondent that this claim is forfeited. In any event, we determine that appellant's constitutional rights were not violated.

### 1.	*This claim is forfeited.*

Our Supreme Court holds that, when a defendant fails to object during trial, a defendant forfeits any argument on appeal that a trial court failed to adequately admonish a jury at each adjournment not to read, view, or listen to media coverage of the trial. (*People v. Clark* (2011) 52 Cal.4th 856, 955.) Here, appellant concedes that her defense counsel failed to request additional admonishments during the course of this trial. She also concedes that her counsel did not request the court to order the witnesses to avoid media coverage until completing their testimony. Finally, she concedes that her counsel did not request any additional measures to protect her right to a fair trial in light of the live coverage that appeared on the Internet.

Based on a failure to raise these issues below, appellant has forfeited them on appeal. (*People v. Clark*, *supra*, 52 Cal.4th at p. 955; see also *People v. Heard* (2003) 31

---

case. During that same period, it only admonished the jury four times to avoid media coverage.

Cal.4th 946, 972, fn. 12 [failure to raise constitutional challenges at trial results in forfeiture].)  In any event, we conclude that this claim fails on its merits.[26]

### 2.    *Appellant's constitutional rights were not violated.*

Pretrial publicity by itself, even if it is pervasive and adverse, does not inevitably lead to an unfair trial.  (*People v. Peterson* (2020) 10 Cal.5th 409, 440; see also *Dobbert v. Florida* (1977) 432 U.S. 282, 303 [a community's "extensive knowledge" of the criminal matter "is not sufficient by itself to render a trial constitutionally unfair"].)  However, the United States Supreme Court has overturned criminal convictions when press coverage has " 'utterly corrupted' " the trial atmosphere.  (*Skilling v. United States* (2010) 561 U.S. 358, 380 [see opinions cited therein].)  In such a situation, prejudice is presumed.  (*Id.* at pp. 381–382.)

The Ninth Circuit Court of Appeals has adopted a two-prong test for determining when a defendant's right to jury trial under the federal Constitution has been violated by excessive and unfair publicity.  (*Hart v. Stagner* (9th Cir. 1991) 935 F.2d 1007, 1014.)  A defendant may show either (1) presumed prejudice because the community was saturated with inflammatory and prejudicial media publicity about the crime or (2) actual prejudice from jurors who demonstrated actual hostility or partiality that could not be set aside.  (*Ibid.*)

Appellant claims that her judgment should be reversed without any showing of prejudice.  She asserts that this is "an extreme case" where the media coverage " 'manifestly tainted' " her trial.  She insists that her trial was rendered fundamentally unfair, requiring reversal on all counts.  In the alternative, she argues that the media

---

**26**    Because this claim fails on its merits, we do not address appellant's assertion that her trial counsel rendered ineffective assistance.  Appellant cannot show that she was prejudiced by her trial counsel's performance.  (See *People v. Holt*, *supra*, 15 Cal.4th at p. 703 [defendant not entitled to relief on claim of ineffective assistance of counsel where he made insufficient showing as to prejudice].)

coverage adversely impacted her trial, and reversal is warranted based on a denial of due process.

We reject appellant's arguments. Nothing demonstrates that the press coverage in this matter "utterly corrupted" the trial atmosphere so that we must presume prejudice. This trial did not occur in a very small community and nothing reasonably suggests that 12 impartial jurors could not be empaneled. (See *Skilling v. United States*, *supra*, 561 U.S. at p. 382.) Nothing shows that news stories about appellant contained confessions "or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." (*Ibid*.) This trial occurred about three years after Robert's murder, so there was some time for interest to wane. Finally, appellant's jury acquitted her of two felony counts. All of these circumstances counter against presuming prejudice in this matter.[27] (See *Skilling v. United States,* at pp. 382–383 [examining the relevant factors].)

Moreover, although this trial was shown live on the Internet, nothing demonstrates a "carnival atmosphere" had existed from intrusive media presence inside the courtroom. (See *Sheppard v. Maxwell* (1966) 384 U.S. 333, 358.) Nothing shows that the trial became confusing for the jury or the participants. (See *Estes v. Texas* (1965) 381 U.S. 532, 551.) Nothing suggests that any of the trial participants or the jurors were intimidated, harassed or improperly interviewed by the media. Nothing establishes that the media coverage dominated the courtroom proceedings or disrupted events. Indeed,

---

[27]    These factors from *Skilling* were used, in part, to determine whether a presumption of prejudice had occurred so that a change in venue should have been ordered. (*Skilling v. United States*, *supra*, 561 U.S. at p. 385.) Because they were considered as part of a motion to change venue, appellant argues it is improper for this court to consider these factors in assessing whether she is entitled to a presumption of prejudice. We disagree. Although these factors were used in a different procedural context, the United States Supreme Court relied on them, at least in part, to examine whether it was necessary to presume juror prejudice from media exposure. (*Skilling*, *supra*, at pp. 381–382.) These factors provide some guidance in this situation.

appellant concedes in her reply brief that her trial "did not have the disruptive and circus-like atmosphere in the courtroom" that was present in some of the opinions on which she relies.

Appellant contends that, although her trial was not a "spectacle" inside the courtroom, it was nevertheless tainted because of extensive media coverage and livestreaming. She raises concerns that jurors or witnesses *may* have viewed the extensive media coverage, and witnesses *may* have discussed the case with each other without a gag order from the trial court. The court, however, repeatedly admonished the jurors not to watch, read or listen to any media coverage, and the court made it clear that this was a serious concern for the court and the parties. The jurors were told on multiple occasions that they must base their decisions solely on the evidence presented in court. As such, although the court did not admonish the jury daily to avoid media coverage, we reject appellant's argument that the court did not provide adequate admonishments in this regard. We find unpersuasive her argument that prejudice must be presumed in this matter.

Finally, the California Supreme Court holds it is not proper to assume on a silent record that jurors ignored a trial court's orders and admonishments. (*People v. Westerfield* (2019) 6 Cal.5th 632, 731–732.) It is likewise impermissible for a reviewing court to assume on a silent record that jurors were exposed to prejudicial material. (*Id.* at p. 732.) To establish actual juror prejudice under federal law, a defendant "must show that a juror cannot lay aside any preconceived impression or opinion of the case and decide the case solely on the evidence." (*Willard v. Pearson* (7th Cir. 1987) 823 F.2d 1141, 1146, citing *Murphy v. Florida* (1975) 421 U.S. 794, 800.) The question is whether jurors "had such fixed opinions that they could not judge impartially the guilt of the defendant." (*Patton v. Yount* (1984) 467 U.S. 1025, 1035.)

Although approximately 41 witnesses testified in this matter, the issues surrounding appellant's guilt for the charged crimes rested largely on the credibility of

40.

two witnesses, Hearn and appellant. We will not speculate on this silent record whether the jurors and witnesses *may* have viewed the extensive media coverage, or how that exposure *may* have impacted them. In any event, this record neither demonstrates nor even reasonably suggests that either the jurors or the witnesses were impermissibly impacted by the media coverage. In fact, the opposite is true. The jury acquitted appellant of two felony charges, and it did not find true all of the alleged overt acts in support of the conspiracy charge.[28] The entire record and the jury's actions run counter to any concern that a fundamentally unfair trial occurred, or that appellant's constitutional right to an impartial jury was violated. Consequently, this claim is without merit and reversal is not appropriate.

## VII. The Trial Court did not Abuse its Discretion in Declining to Sequester the Jury.

Appellant asserts that the trial court erroneously denied her motion to sequester the jury. She contends that her convictions must be reversed.

### A. Background.

As part of motions in limine, the defense requested the jury to be sequestered based on the "widespread" pretrial publicity, and "the vitriolic feedback" targeted towards appellant from the general population. At oral argument, the defense expressed concern that appellant could not receive a fair trial, noting the pervasive media presence in the courtroom. Defense counsel asserted that, based on smartphones, it was "almost impossible" to preclude the jurors from being exposed to media coverage about this trial. After hearing from both parties, the trial court stated it was going to take "extra precautions" because of the "amount of exposure in this case." The court stated its intent

---

[28] The jury found the following three alleged overt acts *not* true: (1) Hearn had mixed arsenic with pudding; (2) Hearn had delivered the pudding with arsenic to appellant's residence; and (3) appellant had placed the pudding with arsenic in Robert's lunch.

to "explain to the jury that they're not to read or consider anything that's going on outside of the courtroom." The court stated it had not "gotten quite a feel yet for the jury as to what the extent of the exposure is to the case." The court denied the motion for sequestration without prejudice.

After the jurors were sworn, the court informed them about the media coverage that would likely occur during the trial. The court then addressed a motion for change of venue. The court summarized the results of the juror questionnaires. After hardships were granted, a pool of 104 prospective jurors remained. Those 104 individuals had received the publicity questionnaire. From that group, 44 individuals (or 42.3 percent) had stated they had no exposure at all to this case. Another 31 individuals (or 29.8 percent) had reported exposure, but stated they were not affected by what they had read. 16 individuals (or 15.3 percent) had been exposed, and stated they were affected by the media coverage and could not be fair. A final 13 individuals (or 12.5 percent) had shown some type of legal cause or hardship. Based on these numbers, the court denied a motion for a change of venue.[29] The court then turned to the motion to sequester the jury.

The court stated it was very reluctant to sequester the jury for perhaps four weeks. It noted it had already warned the jurors not to be "exposed in any way or fashion to anything regarding this case as it related to the media or with their family or friends." The court stated it planned to admonish the jury daily. The court again denied the motion for sequestration without prejudice.

### B.    *Standard of review.*

A trial court has statutory discretion to sequester a jury. (§ 1121.) As such, a deferential abuse of discretion standard is used to review a trial court's decision to not sequester a jury. (*People v. Westerfield*, *supra*, 6 Cal.5th at p. 682.) Under this standard, a reviewing court will not disturb the trial court's decision on appeal unless "the court

---

[29]    Appellant is not challenging the court's denial of a motion for change of venue.

exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; see *People v. Williams* (1998) 17 Cal.4th 148, 162 [abuse of discretion review asks whether ruling in question falls outside bounds of reason under applicable law and relevant facts].)

### C.     Analysis.

Appellant argues that the trial court clearly abused its discretion because, at the time it denied the motion to sequester, it had already granted a request to permit the media to livestream the trial. Appellant contends it was "essentially impossible" for the jurors to avoid media coverage unless they were sequestered. She notes that the media coverage of this case had made its way into the jury assembly room, and she asserts that the court did not take "any action" after learning about that issue. Appellant further argues that the court erred because it only considered the length of the trial and it did not consider other "numerous factors" that supported sequestration, such as the potential impact of the media coverage in today's digital world. She notes that three of the sworn jurors had admitted to being exposed to pretrial media coverage. She argues it is "unknown" whether there were additional jurors in this group.

We reject appellant's arguments. The trial court was in the best position to evaluate the necessity of sequestration. (See *People v. Westerfield*, *supra*, 6 Cal.5th at p. 682.) Our Supreme Court has concluded that a lengthy trial estimated to last four to six weeks may provide valid grounds to deny sequestration. (*People v. Hernandez* (1988) 47 Cal.3d 315, 338.) In the context of evaluating whether to grant a motion to change venue, our Supreme Court further holds that, when pretrial publicity is an issue, it is important to put primary reliance on the trial court because the judge sits in the locale where it is claimed the publicity may have an impact, and the judge may base his

evaluation on his own perception of the depth and extent of news stories that might influence a juror. (*People v. Scully* (2021) 11 Cal.5th 542, 568.)

In this matter, an abuse of discretion is not present. The court had valid concerns regarding the anticipated length of this trial, and the court admonished the jury to avoid any media exposure about the case. We disagree with appellant's contention that the court did not admonish the jury enough. Although the court did not provide a daily admonishment to avoid media coverage, appellant provides no authority that establishes that daily admonishments are required. In any event, our Supreme Court has concluded that multiple admonitions to a jury are sufficient to satisfy the requirements of section 1121.[30] (See *People v. Clark*, *supra*, 52 Cal.4th at p. 956.) The trial court informed the prospective jurors multiple times during voir dire not to watch any media coverage of this matter. The court admonished the jurors multiple times during trial to not form any opinions, and to avoid any media coverage. Just before the first witness testified, the court admonished the jurors that their verdict must be based only on the evidence presented during this trial. When excused for the day before closing arguments started, the jurors were again reminded to not "form or express any opinion or discuss the case. Don't watch any media coverage." Before the matter was submitted to them, the jurors were instructed to not conduct any research or rely on the Internet, and to decide the case based solely on the evidence presented in court. This record overwhelmingly demonstrates that the jury was properly and adequately admonished to avoid media coverage.

Finally, we reject appellant's assertion that the trial court only focused on the length of the sequestration, and it failed to balance all relevant factors, including the media coverage that had been shown in the jury assembly room. To the contrary, the

---

[30] Section 1121 states that, if a trial court does not sequester a jury, then "the court shall properly admonish them."

44.

court and the parties extensively questioned each prospective juror who had disclosed any prior media exposure. It is evident from the voir dire process that a fair and impartial trial could be had without sequestration. (See *People v. Hernandez*, *supra*, 47 Cal.3d at p. 338.) Just before denying the motion for sequestration, the court reviewed the numerical breakdown of those potential jurors who had, and who had not, been exposed to pretrial publicity. It is apparent the court felt confident that any pretrial publicity had not negatively impacted the jurors. We cannot state that the court exercised its discretion denying the motion for sequestration in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (See *People v. Rodrigues*, *supra*, 8 Cal.4th at pp. 1124–1125.) The court's ruling does not fall outside the bounds of reason under the applicable law and relevant facts. (See *People v. Williams*, *supra*, 17 Cal.4th at p. 162.) Thus, an abuse of discretion is not present and reversal is not warranted.[31]

## VIII. Appellant has Forfeited her Claim of Prosecutorial Misconduct; this Claim also Fails on its Merits and any Presumed Error is Harmless.

Appellant claims that the prosecutor committed prejudicial misconduct during closing argument by misstating the law regarding conspiracy. She contends that her conviction for conspiracy to commit murder (count 2) must be reversed.

### A.    Background.

At the beginning of closing arguments, the prosecutor reviewed each charge with the jurors. We highlight in bold the disputed language which appellant contends amounts to misconduct.

---

[31]    Appellant maintains that the trial court's failure to sequester the jury resulted in structural error, requiring automatic reversal of her judgment. In the alternative, she contends that she suffered prejudice under the federal standard of *Chapman v. California* (1967) 386 U.S. 18 because her trial was rendered fundamentally unfair. Because we conclude that the trial court did not abuse its discretion, we do not analyze any alleged prejudice. In any event, this record amply demonstrates that the denial of the motion for sequestration did not render this trial fundamentally unfair.

The prosecutor noted for the jurors that count 1 involved the murder of Robert, which occurred on or about August 17, 2014. Regarding count 2, the prosecutor stated it had "a broader time frame." The prosecutor asserted that the conspiracy charge began on March 19, 2014, when Hearn tried to acquire arsenic trioxide. The prosecutor said that **"a conspiracy does not end until you are contacted by law enforcement, because a conspiracy can include evading law enforcement**." The prosecutor noted that appellant and Hearn were arrested on November 18, 2014.

Appellant's trial counsel did not object or seek an admonition when the prosecutor made this disputed remark.

### B. *Standard of review.*

To prevail on a claim of prosecutorial misconduct based on remarks to the jury, a defendant must show a reasonable likelihood the jury understood or applied the disputed comments in an improper or erroneous manner. (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).) In making this showing, the defendant should examine the prosecutor's entire argument and the jury instructions. (*Ibid.*)

### C. *Analysis.*

Appellant argues that the prosecutor misstated the law because a conspiracy generally ends when the substantive crime that is the object of the conspiracy has been achieved or defeated. She contends that this misconduct prejudiced her because it reduced the prosecution's burden of proof. She asserts that her conviction for conspiracy to commit murder (count 2) must be reversed.

We reject appellant's arguments. First, this claim is forfeited. Second, it is not reasonably likely the jury understood or applied the disputed comment in an improper or erroneous manner. Finally, any presumed error is harmless under any applicable standard.

### 1. *This claim is forfeited.*

As a rule, a claim of prosecutorial misconduct is forfeited if the defense fails to object and request an admonition to cure any harm. (*Centeno*, *supra*, 60 Cal.4th at p. 674; *People v. Tully* (2012) 54 Cal.4th 952, 1010.) Our Supreme Court makes it clear that a claim of prosecutorial misconduct will not be deemed forfeited "only when 'an objection would have been futile or an admonition ineffective.' [Citation.]" (*People v. Thomas* (2012) 54 Cal.4th 908, 937.) As the high court has stated, "we see no reason to carve out an exception to the general rule that a defendant must object to misconduct at trial to raise the claim on appeal. [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 762 [addressing claim that the prosecutor improperly suggested the responsibility for a death verdict rested elsewhere].)

Here, appellant concedes that her trial counsel failed to object or seek an admonition when the prosecutor made his disputed statement during closing argument. This record does not show that an objection would have been futile or an admonition ineffective. Thus, our Supreme Court precedents make it clear that this claim must be deemed forfeited. In any event, we also reject this claim on its merits.[32]

### 2. *It is not reasonably likely the jury understood or applied the disputed comment in an improper or erroneous manner.*

A prosecutor commits misconduct if he or she misstates the applicable law. (*People v. Boyette* (2002) 29 Cal.4th 381, 435.) We agree with appellant that a conspiracy usually ends when the substantive crime for which the coconspirators are being tried is either attained or defeated. (*People v. Hardy* (1992) 2 Cal.4th 86, 143; *People v. Leach* (1975) 15 Cal.3d 419, 431.) On the other hand, respondent is correct that the alleged prosecutorial misconduct must be considered in the context of the

---

**32** Because we reject this claim on its merits, we need not analyze appellant's claim of ineffective assistance of counsel. (See *People v. Holt*, *supra*, 15 Cal.4th at p. 703 [defendant not entitled to relief on claim of ineffective assistance of counsel where he made insufficient showing as to prejudice].)

prosecutor's entire argument and the jury instructions. (See *Centeno*, *supra*, 60 Cal.4th at p. 667.) We conclude that, when the entire record is examined, it is not reasonably likely the jury understood or applied the disputed comment in an improper or erroneous manner. As such, even if the prosecutor's brief disputed remark was a misstatement of law, this claim is without merit.

With CALCRIM No. 563, the jury was properly instructed on the elements necessary to find appellant guilty in count 2 for conspiracy to commit murder: (1) appellant must have intended to agree and did agree with Hearn to kill intentionally and unlawfully; (2) at the time of the agreement, she and Hearn intended that one or more of them would intentionally and unlawfully kill; and (3) she or Hearn or both of them committed at least one of 10 alleged overt acts to accomplish the killing. The jury was instructed that the People were required to prove that the members of this alleged conspiracy "had an agreement and intent to commit murder." The jurors were instructed that the overt acts must be done "by one or more members of the conspiracy" to "accomplish the agreed-upon crime." The jury was told that an overt act must have happened after appellant "has agreed to commit the crime."

The prosecutor informed the jurors during closing argument that, for appellant to be guilty in count 2 for conspiracy to commit murder, an agreement must have existed that an individual "is going to go and kill." The prosecutor asserted that a conspiracy is "a moment in time when a group of people, whether it be two, whether it be 20, get together and decide let's commit this crime." The prosecutor noted that 10 alleged overt acts existed in this matter, and at least one of those overt acts had to have been completed by one member of the conspiracy. The prosecutor argued to the jurors that appellant had expressed a sentiment to Hearn that it would be simpler if Robert was gone, and divorce was not an appealing option. According to the prosecutor, appellant and Hearn plotted together to kill Robert so they could be married.

During rebuttal argument, the prosecutor asserted that appellant's and Hearn's actions showed "an agreement" and "a plan." According to the prosecutor, appellant and Hearn had worried that their phones were tapped. The prosecutor argued that the wiretaps were a "snapshot in time" that showed their state of mind because they were the ones who "committed the crime."

The jury found true certain overt acts in support of this conspiracy, including that (1) Hearn purchased a cellular phone (i.e., the burner) to escape law enforcement detection; (2) appellant used that phone; (3) appellant provided information to Hearn regarding the BNSF shop location in Tehachapi; (4) appellant informed Hearn that Robert would be working in Tehachapi on August 17, 2014; and (5) Hearn shot and killed Robert on that date. None of the alleged overt acts which the jury were asked to consider took place after the date of Robert's murder.[33]

Based on this record, appellant has not shown a reasonable likelihood the jurors understood or applied the prosecutor's disputed comment in an improper or erroneous manner. (See *Centeno*, *supra*, 60 Cal.4th at p. 667.) The jury was properly instructed on the law regarding the charge in count 2 for conspiracy to commit murder. None of the alleged overt acts in support of the conspiracy occurred after Robert's murder. Even if the prosecutor made a misstatement of law, it was extremely brief and not repeated. Consequently, appellant's arguments are without merit and this claim fails. In any event, we also conclude that any presumed error was harmless.

---

[33] Prior to the jury being instructed in this matter, the trial court granted the People's motion to dismiss the only alleged overt act that would have necessarily occurred after the murder. In overt act No. 11, it was alleged that appellant "did not tell law enforcement about her extra marital affair" with Hearn. Appellant concedes that the jury was never instructed on this dismissed overt act.

### 3. *Any presumed error is harmless.*

Appellant contends that this was a close case because the jury deliberated for almost six hours over the course of three days before reaching its verdicts. According to appellant, it is possible at least one juror may have found that appellant entered into this conspiracy to commit murder "based solely on her actions after the murder."[34] She argues that reversal is required due to this prejudice. We disagree. Even if misconduct occurred, it was harmless.

The jury was properly instructed regarding the elements necessary to find appellant guilty in count 2 for conspiracy to commit murder. The jurors found true multiple overt acts in support of the conspiracy. All of the overt acts which the jury considered terminated at the commission of Robert's murder. As such, it is overwhelmingly apparent that the jury focused on appellant's actions leading up to Robert's murder when finding her guilty of conspiracy. Thus, we can declare beyond any reasonable doubt that the prosecutor's disputed statement did not contribute to the verdict. (See *Chapman v. California*, *supra*, 386 U.S. at p. 24.) Likewise, it is not reasonably probable the verdict would have been more favorable to appellant absent this alleged misconduct. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) Accordingly, prejudice is not present under any applicable standard, and this claim is without merit.

## IX. Appellant Was Properly Convicted for both Murder and Being an Accessory to the Same Murder.

In count 1, appellant was convicted of first degree premeditated murder (§ 187, subd. (a)), and she was sentenced to an indeterminate term of 25 years to life. In count 6,

---

[34] Appellant notes that, with CALCRIM No. 207, the jury was instructed that the crimes in this matter occurred on or about March 30, 2014, through November 18, 2014 (which was well after Robert's murder in August). The court, however, did not specifically indicate which charged crimes were alleged to have taken place within the stated time. In a footnote, appellant acknowledges that this represented instructional error, but she is not asserting such error was prejudicial.

she was convicted of being an accessory to the same murder (§ 32), and she received a consecutive determinate low term of 16 months.[35]

Appellant asserts that, if her murder conviction is affirmed, her conviction for being an accessory to the murder must be reversed. She acknowledges that courts are divided on this issue.[36] She relies primarily on two opinions: (1) *People v. Nguyen* (1993) 21 Cal.App.4th 518 (*Nguyen*) and (2) *In re Eduardo M.* (2006) 140 Cal.App.4th 1351 (*Eduardo M.*).

In *Nguyen*, the Third Appellate District held that, when a principal commits acts with the requisite intent that would otherwise constitute the elements of being an accessory, such conduct "is subsumed within his guilt as a principal and he may not be convicted both as a principal and as an accessory." (*Nguyen*, *supra*, 21 Cal.App.4th at p. 536.)

In *Eduardo M.*, the Second Appellate District held that a defendant cannot be convicted as both a principal and an accessory to the same crime based solely on the defendant's immediate flight from the crime scene and subsequent denials of his own involvement, even if that conduct incidentally helps other principals escape. (*Eduardo M.*, *supra*, 140 Cal.App.4th at p. 1359.)

Respondent contends we should follow this court's opinion in *In re Malcolm M.* (2007) 147 Cal.App.4th 157 (*Malcolm*). In *Malcolm*, this court held that a person may be

---

[35]   In count 2 (conspiracy), the court imposed but stayed a term of 25 years to life. In count 3 (solicitation), the court imposed but stayed a low term of three years.

[36]   In *People v. Prado* (1977) 67 Cal.App.3d 267, a codefendant was found guilty of both robbery and accessory to robbery. (*Id.* at p. 270.) The appellate court held it was improper to convict the codefendant of both crimes because they were mutually exclusive with different criminal intents. (*Id.* at p. 273.) In contrast, other courts have held that the crimes of being an accessory and a principal are not mutually exclusive, and a defendant may be convicted of both charges under certain circumstances. (*People v. Riley* (1993) 20 Cal.App.4th 1808, 1813–1814, citing *People v. Francis* (1982) 129 Cal.App.3d 241, 251–252.)

51.

convicted as an accessory after the fact to a felony, and also convicted as an aider and abettor in the commission of the same crime, so long as the convictions were based on different acts and intents. (*Id.* at p. 171.) However, if the acts constituting the felony have not ceased, then the intent to be an accessory after the fact is subsumed into the conduct of aiding in the commission of the crime. (*Ibid.*)

We agree with the holding in *Malcolm* and we follow it here. We decline appellant's invitation to rely on *Nguyen* and *Eduardo M.* Based on *Malcom*, we conclude that appellant was properly convicted in both count 1 and count 6. She aided and abetted Hearn in committing this murder when she provided Hearn with information about Robert's work location and Robert's work schedule in Tehachapi. In the weeks and months following this murder, appellant lied to law enforcement about her relationship with Hearn, and she did not disclose that Hearn was a possible suspect who matched the description provided to her by Meyer. Instead, appellant provided Meyer with names of two other males. After her arrest, she admitted to law enforcement that, at some point following Robert's murder, she had come to suspect that Hearn might have been involved.

Appellant contends that her accessory conviction cannot stand because, assuming she had agreed with Hearn to aid and abet in Robert's murder, then her active concealment of her relationship with Hearn was a continuation of the plan to kill Robert. According to appellant, her lies to law enforcement were her attempts to avoid her own criminal liability for murder. She argues that *Malcolm*, the opinion which respondent relies upon, actually supports her position and requires reversal of her accessory conviction. We disagree.

This court in *Malcom* held "that, in order to find someone to be an accessory after the fact to a felony in the commission of which the person is also a principal by virtue of his or her having aided and abetted its commission, the acts constituting that felony must

52.

have ceased at the time of the conduct that violates section 32."[37] (*Malcolm*, *supra*, 147 Cal.App.4th at p. 171.) Here, Robert's murder was long over when appellant provided false information to law enforcement, including the names of males who had no connection to this crime. Robert's murder was completed by the time the acts comprising appellant's accessory liability were performed. Consequently, appellant's conduct no longer constituted aiding and abetting the murder.

This record demonstrates that appellant's convictions in counts 1 and 6 were based on different acts and intents. In other words, the conduct that gave rise to her criminal liability in count 1 had ceased by the time she undertook other actions that gave rise to her criminal liability in count 6. As such, there is nothing inconsistent between these convictions. (See *People v. Riley*, *supra*, 20 Cal.App.4th at p. 1815 [rejecting similar argument].) Thus, appellant is both liable for the murder as an aider and abettor, as well as being an accessory after the fact to the same murder. (See *Malcolm*, *supra*, 147 Cal.App.4th at p. 171.) Accordingly, we reject appellant's various arguments and reversal of count 6 is not appropriate.

## X. Appellant's Sentence Does Not Violate Either The Federal or California Constitution.

In count 6, appellant was sentenced to a determine prison term of 16 months (the low term) for being an accessory after this murder. This sentence was imposed consecutively to the sentence in count 1, wherein she received an indeterminate term of 25 years to life for murder. In the present claim, appellant asserts that her sentence represents cruel and unusual punishment under both the federal and California Constitutions. She contends that her sentence is grossly disproportionate to her

---

[37] Section 32 reads as follows: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

individual culpability. She asserts that her sentence should be stricken, and this matter remanded to the trial court with directions for it "to impose a sentence that is proportionate" to her culpability. We disagree. As an initial matter, this claim is forfeited. In any event, it also fails on its merits.

## A.     *This claim is forfeited.*

As appellant concedes, she did not raise this constitutional claim when the trial court imposed her sentence. "A claim a sentence is cruel and unusual is forfeited on appeal if it is not raised in the trial court, because the issue often requires a fact-bound inquiry." (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247.) Appellant's failure to raise this constitutional issue below results in its forfeiture on appeal. (*People v. Gamache* (2010) 48 Cal.4th 347, 403 [defendant forfeited various claims under due process and Eighth Amendment by failing to object below]; *People v. Mungia* (2008) 44 Cal.4th 1101, 1140–1141.) She cannot argue that the trial court erred in failing to conduct an analysis it was not asked to conduct. (See *People v. Partida*, *supra*, 37 Cal.4th at p. 435.) As such, this claim is forfeited. In any event, however, we also conclude that this claim fails on its merits.[38]

## B.     *This claim fails on its merits.*

Appellant argues that her limited personal culpability in this matter, coupled with her lack of danger to society, demonstrates that her sentence constitutes cruel and unusual punishment. She contends that, other than providing Hearn with information about the location of Robert's shop in Tehachapi and informing Hearn that Robert would be working there on August 17, 2014, there was no corroboration of Hearn's testimony that

---

[38]     Because we also address and reject this claim on its merits, we need not address any alleged ineffective assistance of counsel. Appellant cannot show she was prejudiced by her trial counsel's performance. (See *People v. Holt*, *supra*, 15 Cal.4th at p. 703 [defendant not entitled to relief on claim of ineffective assistance of counsel where he made insufficient showing as to prejudice].)

she did anything further to aid and abet in this murder. She asserts that, unlike her, Hearn is an extremely dangerous person, and it is outrageous that she received a longer sentence.[39] She notes that she has two minor children, and she contends that she will not be eligible for parole until 2036, while Hearn will be eligible for parole commencing in 2028.[40] She maintains that this is a unique case wherein her sentence both " 'shocks the conscience' and 'offends fundamental notions of human dignity.' "

We reject all of appellant's various arguments. The Eighth Amendment of the United States Constitution prohibits the infliction of "cruel and unusual" punishments.[41] (*In re Alva* (2004) 33 Cal.4th 254, 266.) Likewise, article I, section 17, of the California Constitution prohibits the infliction of " '[c]ruel or unusual' " punishments.[42] (*In re Alva*, *supra*, 33 Cal.4th at p. 266.) A punishment violates the Eighth Amendment of the

---

[39]    Hearn informed the jury that, pursuant to his plea agreement, he would receive a prison sentence of 25 years four months based on a conviction for voluntary manslaughter with a firearm enhancement. He was originally charged with first degree murder, along with a special circumstance allegation of lying in wait. He initially faced an indeterminate prison sentence of life without the possibility of parole or death, but the prosecution waived the death penalty before the plea agreement was reached.

[40]    The California Department of Corrections and Rehabilitation (CDCR) online inmate locator reflects that Hearn is currently eligible for parole in November 2028 as a "youth offender." (<CDCR Inmate Information (ca.gov)> [as of Oct. 14, 2022].) The same site shows that appellant is eligible for parole in December 2033. (<CDCR Inmate Information (ca.gov)> [as of Oct. 14, 2022].) On this court's own motion, we take judicial notice of these facts. (Evid. Code, § 452, subd. (h) [courts can take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy"]; see also *People v. Seumanu* (2015) 61 Cal.4th 1293, 1372–1373 [courts can take judicial notice of facts from Web site maintained by CDCR].)

[41]    The guarantee of the Eighth Amendment applies to the states through the Fourteenth Amendment of the United States Constitution. (*Rhodes v. Chapman* (1981) 452 U.S. 337, 344–345.)

[42]    The California Supreme Court has "never suggested that article I, section 17 employs a different or broader definition of 'punishment' itself than applies under the Eighth Amendment." (*In re Alva*, *supra*, 33 Cal.4th at p. 291.)

United States Constitution if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173.) Similarly, a punishment may violate article I, section 17, of the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*), superseded by statute on other grounds as explained in *In re Palmer* (2021) 10 Cal.5th 959, 974.)

Three criteria are used to determine whether a sentence is "cruel or unusual" under article 1, section 17, of the California Constitution: (1) the nature of the offense and the offender (with particular attention to the degree of danger both factors may pose to society); (2) a comparison of the sentence with those for other more serious offenses under California law; and (3) a comparison of the sentence with those in other states for the same offense. (*Lynch*, *supra*, 8 Cal.3d at pp. 425–427.) Proportionality may be shown by any of the three relevant factors. (*People v. Dillon* (1983) 34 Cal.3d 441, 487, fn. 38 (plur. opn. of Mosk, J.).) A defendant bears a "considerable burden" of proof to establish one of these factors. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.)

Although appellant received a slightly longer prison sentence than Hearn, that does not factor into our analysis. It is not appropriate to consider the length of a coconspirator's sentence when examining whether a particular sentence represents cruel and unusual punishment. (See *People v. Debose* (2014) 59 Cal.4th 177, 212; *People v. Thomas*, *supra*, 54 Cal.4th at pp. 940–941.) As such, we decline to examine whether or not appellant's and Hearn's respective sentences are improperly disproportionate.

In considering whether appellant's punishment is constitutionally impermissible, we must view the underlying disputed facts in the light most favorable to her judgment. (*People v. Em* (2009) 171 Cal.App.4th 964, 971; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 569; *People v. Martinez* (1999) 76 Cal.App.4th 489, 496.) In addition to being convicted of first degree premeditated murder (count 1) based on a theory of

aiding and abetting, the jury also convicted her of (1) conspiracy to commit murder (§ 182, subd. (a)(1); count 2); (2) solicitation to commit murder (§ 653f, subd. (b); count 3); and (3) being an accessory to the murder (§ 32; count 6). Viewing the facts in the light most favorable to these convictions, appellant told Hearn to kill her husband, they agreed to work together towards that goal, she provided Hearn with critical information about where and when to find Robert working alone in Tehachapi, she lied to law enforcement after this murder to conceal her relationship with Hearn, and she provided false leads to law enforcement during its investigation.

When viewed in the light most favorable to the judgment, appellant's behavior cannot be described as minor or insignificant. Although appellant had no prior criminal record, we cannot declare that her punishment violates the Eighth Amendment of the United States Constitution. The statutory sentence of 25 years to life for her conviction of premeditated first degree murder neither demonstrates an "unnecessary and wanton infliction of pain" nor is it "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia*, *supra*, 428 U.S. at p. 173.) Likewise, her sentence does not violate article I, section 17, of the California Constitution because it is not "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424.)

"In our tripartite system of government, the legislative branch defines crimes and prescribes punishment." (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1145.) It is rare when an appellate court may declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive. (*Ibid.*)

In this matter, our independent review demonstrates that appellant's punishment is neither cruel nor unusual based on the facts viewed in the light most favorable to the judgment. Accordingly, we reject appellant's constitutional challenges to the imposition of her sentence, and resentencing is not appropriate.

## XI.    Cumulative Error did not Occur.

Appellant raises a claim of cumulative error.  She contends that, based on the totality of some of the errors identified above, she suffered a fundamentally unfair trial.  She asserts that a new trial is required.  We disagree.

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial."  (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)  A claim of cumulative error is essentially a due process claim.  (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.)  The test is whether the defendant received a fair trial.  (*Ibid.*)

We reject appellant's claim of cumulative error because we have denied all of her individual claims.  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].)  Taking all of appellant's claims into account, we are satisfied that she received a fair adjudication regarding her guilt for Robert's murder.  A new trial is not required, and this claim fails.

### DISPOSITION

The judgment is affirmed.


LEVY, Acting P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.

58.